WALDO *v* WALLACE.

In determining whether or not an office is judicial in its character, within the meaning of § 16, art. 7, of the constitution, the Courts will, where the statute is not clear upon the point, look to the jurisdiction and duties of the officer.

The mayor of a city, organized under the general law of 1857, is a judicial officer, within the meaning of that constitutional provision, if at the time of his election no order had been made by the city council for the election of a city judge, and no such judge had been elected.

The executive and administrative duties of the mayor of a city, under the act of 1857, are not within the executive and administrative departments of the state government, as established by the constitution. In respect to such duties, the mayor is merely an officer of a municipal corporation; and he may discharge such duties and his judicial functions at the same time, without violating § 1 of art. 3 of the constitution.

The judicial duties of the mayor are not incidental to his municipal office, but

separate and independent of it; for he is clothed, in this respect, with general power to administer, judicially, the laws of the state.

The statute conferring judicial powers upon the mayor of a city, is not unconstitutional.

The mayor of a city, under the act of 1857, when acting as such, is not a state officer; and in acting both as mayor and city judge, he acts in two capacities. Thus, the same act may, on the same day, be punished by him once as mayor, acting for the city, and once as judge, for a violation of the laws of the state; and one of these prosecutions will be no bar to the other. PERKINS, J.

And though he would act in two capacities or offices, but one of them would be an office under the state. PERKINS, J.

A Court is a tribunal charged with a substantive duty—the exercise of judicial power; and a judicial officer is the person appointed to exercise that power. PERKINS, J.

A judge will be not the less a judicial officer because some duties he may have to perform are administrative in their character; nor will an administrative officer become a judicial officer simply because some of his duties may be, to some extent, judicial in their character. PERKINS, J.

The duties of a mayor, as a state officer, are entirely judicial; and they are continuous for his official term, and are discharged in the form and with the effect of proceedings in the other Courts of the state. PERKINS, J.

A mayor being a judicial officer of the state, elected in a manner which, under the unrestricted power of creating Courts conferred by the constitution, the legislature might adopt, he is ineligible to any office other than a judicial one, during the term for which he is elected. PERKINS, J.

APPEAL from the *Marion* Circuit Court.

HANNA, J.— The city of *Indianapolis* is incorporated under the general law for the incorporation of cities, approved *March* 9, 1857. [Acts of 1857, p. 42.] At the municipal election in *May* of that year, *Wallace* was elected mayor for the term of two years.

The common council had not ordered the election of a city judge, as they were authorized to do by § 9 of that act. In the absence of such order and election, it is enacted by § 18, among other things, that "He [the mayor] shall hold a city Court every day, *Sundays* excepted, at, &c.; whilst sitting as such Court, he shall have exclusive jurisdiction of all prosecutions for violation of the by-laws and ordinances of the city and township in which such city is situated; he shall have, within the limits of said city, the jurisdiction and powers of a justice of the peace, in all matters civil and criminal arising under the laws of this state, and for crimes and misdemeanors his jurisdiction shall be co-

extensive with the county in which such city is situated: *provided*, that in trials before him, he shall have power to adjudge imprisonment as a part of his sentence, not exceeding thirty days in the city or county prison. In all [indictments] in the city judge or mayor's Court, either party may have a trial by jury, and a change of venue to a justice of the peace in such city, and appeal to a Court of competent jurisdiction, under the same restriction, and in the same manner, as in a justice's Court; except in cases where the mayor has exclusive jurisdiction, no change of venue shall be allowed. The same rules of pleadings and practice shall be observed in the city or mayor's Court that are in justices' Courts. * * * * All fines and penalties collected by him shall be paid into the city treasury, except when otherwise directed by acts prescribing the duties and powers of justices of the peace. If the common council shall deem it expedient for the interests of such city to cause a judge to be elected, the same may be done at any general election at which the mayor shall also be elected, and such city judge shall give the like bond as the mayor is herein required to give, and he shall, from and after his due qualification, perform all the judicial duties herein required to be performed by the mayor."

*Wallace* took upon himself the duties of the office of mayor—among others, those of a judicial character above set forth.

Within the two years for which he was elected mayor, he resigned that office and was a candidate, and received the greatest number of votes, for the office of sheriff of *Marion* county. This proceeding was commenced ·by *Waldo*, to test the question of his eligibility to the latter office, under § 16, of art. 7 of the constitution of *Indiana*, [which reads thus]: "No person elected to any judicial office, shall, during the term for which he shall have been elected, be eligible to any office of trust or profit under the state, other than a judicial office."

Was the office of mayor of the city of *Indianapolis*, during the term for which *Wallace* was elected, a judicial

May Term, 1859.

WALDO
v.
WALLACE.

office, within the meaning of the constitutional provision above quoted?

We say during that term, because it is not pretended but that the common council, by ordering the election of a city judge, for any succeeding term, might take from the office of mayor all duties, and divest that officer of all powers, of a judicial character. But it is averred that such order had not been made preceding the election for that term; that after the election of *Wallace,* he took upon himself the executive, ministerial, and judicial duties of the office, so far as they were devolved upon him by the act above referred to.

What is a judicial office, and who are judicial officers, who are thus, for a time, prohibited from seeking certain other official stations?

An office is a particular duty, charge, or trust, conferred by public authority, and for a public purpose. Offices are civil, judicial, ministerial, executive, political, municipal, diplomatic, military, ecclesiastical, &c. See Webster's Dict., *h. v.*

An office is a right to exercise a public function or employment, and may be classed into civil and military. And civil may be classed into political, judicial, and ministerial. Political, are such as are not connected immediately with the administration of justice, or the execution of the mandates of a superior officer. Judicial, are those which relate to the administration of justice. Ministerial, are those which give the officer no power to judge of the matter to be done, and require him to obey the mandates of a superior. It is a general rule, that a judicial office cannot be exercised by deputy, while a ministerial may. 2 Bouv. Law Dict. 259.—4 Jacob's Law Dict. 433.—2 Toml. Law Dict. 665.

JUDICIAL.—Belonging, or emanating from a judge, as such. 1 Bouv. Law Dict. 681. Pertaining to Courts of justice. Webster's Dict. Belonging to a cause, trial, or judgment. Bailey's Dict.

By our state constitution, "The powers of the govern-

ment are divided into three separate departments, the legislative, the executive, including the administrative, and the judicial; and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this constitution expressly provided." Art. 3, § 1.

Article 4, treats of the legislative power; article 5, of the executive; article 6, of the administrative power; article 7, of the judicial, as follows:

" Sec. 1. The judicial power of the state shall be vested in a Supreme Court, in Circuit Courts, and in such inferior Courts as the General Assembly may establish."

Thus, by the constitution, the office of supreme judge is made a judicial office, although the jurisdiction of that Court is, by § 4 of the same article, made to depend much upon the legislative will. For that Court has no original jurisdiction, except it be conferred by the legislative power, and the same power might throw around appeals and writs of error such regulations and restrictions as would place but comparatively little business before that Court of last resort under the state government.

So, the office of circuit judge is, in like manner, made a judicial office by the constitution; but to what extent that officer shall have either civil or criminal jurisdiction, depends entirely upon the legislative department. The jurisdiction, civil and criminal, might be so extended as to over burden the officer with business, or the place might be made a mere sinecure; but if made so, it would still be a judicial office, but without prescribed duties attached thereto.

The number, style, and jurisdiction of the inferior Courts, depend upon the action of the General Assembly, as does the number of judges, or judicial officers, by whatever name they may be designated, who shall, in such inferior Courts, judicially administer the law.

The extent of jurisdiction that may be vested in one of those inferior tribunals, whether more or less, does not, therefore, determine the question whether the officer who may hold such Court, or preside at such tribunal during the judicial administration of the law, within the pre-

scribed jurisdiction, is a judicial officer, and the office a judicial office. The true question appears to us to be—Is this office a part of the system established by the General Assembly, under the constitution, to sustain the government therein provided for, by the judicial administration of the laws of the state and of justice? The duties performed by the officer, or the jurisdiction appertaining to the office, may be looked to to determine, in a case where it is not made clear by the constitution or the statute, the inquiry as to whether a particular office is a judicial office or not.

We suppose it would be within the power of the General Assembly, by distinct and separate acts, to create an inferior Court in each county, provide for the election of the judge thereof, fix his compensation, and prescribe his duties and the jurisdiction of such Court. Now, suppose a series of bills were introduced into the General Assembly to carry out such a purpose, and they should all pass into laws except the last named, showing upon their face that the Court thus established was an inferior Court, such as contemplated and embraced by § 1, art. 7, of the constitution; would not the judges elected under these acts, but without their jurisdiction and duties being fixed, be as much judicial officers as circuit judges without prescribed duties? We think they would. We look, then, only to the jurisdiction of a Court or officer, and the duties of the incumbent, for the purpose of arriving at a correct conclusion, as before stated, in the absence of positive enactment in that respect, as to whether the office falls within the constitutional provision.

In the case at bar, the mayor had the same jurisdiction as a justice of the peace, with the additional power to imprison, as a part of the punishment, for offenses against the law. Let us for a moment look to the jurisdiction of that officer. Although, by the constitution, the office, and duration of the term, of justices of the peace, are provided for, yet their powers and duties were to be fixed by law. "A competent number of justices of the peace shall be elected by the voters in each township in the several coun-

ties. They shall continue in office four years, and their powers and duties shall be prescribed by law." Const. art. 7, § 14. Whether the framers of this section had in view the office of justice of the peace, as it anciently existed under the *English* government, where the incumbent was only a conservator of the peace, without judicial powers (Toml. L. D., vol. 2, p. 322), or whether they had in view that office as it had existed in this state, under our old constitution and laws, when the incumbent was vested with judicial powers, civil and criminal, of much importance in our frame of government, we need not stop to inquire, for the reason that the jurisdiction and duties of that officer had been, previous to 1857, so far established and defined by law under the new constitution, as to dispense with the necessity of such an inquiry, and to show clearly that he was, at the passage of the act under which *Wallace* was elected mayor, intrusted with judicial powers of great magnitude. He had "jurisdiction to try and determine suits founded on contract or tort, when the debt or damages claimed, or the value of the property sought to be recovered, does not exceed 100 dollars." 2 R. S. p. 451. He could not try the title to land, nor actions for slander, &c. *Id.* p. 452. He had power to administer oaths, issue subpœnas, and attachments for contempt (*id.* p. 453); and to fine for contempt (*id.* p. 459); to issue a venire, impannel a jury, receive the verdict, grant a new trial, or enter judgment thereon (*id.* p. 460); to issue writs of replevin (*id.* p. 464), attachment for property, and *ne exeat* (*id.* p. 473), *capias ad respondendum*, *capias ad satisfaciendum* (*id.* pp. 469, 470). He had to keep a record of his proceedings. *Id.* p. 453. In state prosecutions, his jurisdiction was coëxtensive with the county. *Id.* p. 497. He had exclusive jurisdiction where the fine assessed could not exceed three dollars; and concurrent, &c., to try and determine all cases punishable by fine only, or by fine with discretion to imprison; and jurisdiction to make examinations in all other cases (*id.* p. 497), to hear applications for surety of the peace (*id.* p. 500), &c.

By turning to 2 R. S. p. 504, it will be seen that four

May Term,
1859.

WALDO
v.
WALLACE.

offenses are pointed out, over which justices had exclusive jurisdiction; and by an act defining misdemeanors, &c. (*id.* pp. 424, 447), there are more than fifty offenses in which a justice had concurrent jurisdiction, &c., and power to hear, try, determine, and assess a fine, which, if not paid or replevied, gave him the further authority to commit to jail, &c. *Id.* p. 500. The power is given to the mayor, as a part of the punishment, to inflict imprisonment in the county jail, not exceeding thirty days, in such cases, we suppose, as the sentence might be applicable. See § 18. All this power and jurisdiction, which was conferred upon a justice of the peace, certainly made his office one of the inferior Courts which the General Assembly might establish, spoken of in § 1, art. 7, of the constitution, if he was not a judicial officer by virtue of § 14 of that article—a point which we need not determine. It is said that "the test of a Court of record is, whether it has or has not the power to fine and imprison." 3 Bouv. Inst. 68. As the same jurisdiction, and, in some respects, greater, was conferred upon, and exercised by, the mayor, *Wallace*, we can come to no other conclusion but that, if such judicial power was legally conferred, he was a judicial officer within the meaning of the constitutional provision quoted. This raises the next inquiry—

Were the duties enjoined upon a mayor, by the statute, of such a character as to fall within the prohibition of § 1, art. 3, of the constitution, heretofore quoted?

*Wallace* was, it is alleged, elected mayor. His duties, as a city judge, have been already fully referred to. It is further provided by the same statute (Laws of 1857, p. 46, § 18), that "It shall be the duty of the mayor to see that the laws of the state, and the by-laws and ordinances of the common council, be faithfully executed within such city; he shall be a conservator of the peace, and as such, shall have, within the city limits, the power conferred upon justices of the peace for that purpose; to exercise supervision over subordinate officers, and to recommend to the common council such measures as he deems for the public good; he shall sign all commissions, licenses, and permits

granted by the common council, and he shall perform such <span></span>May Term, other duties as the nature of his office, and the interests of 1859. the city, require; he shall have the custody of the corpo- WALDO rate seal, and may take and certify," &c.  "The mayor WALLACE. and councilmen of the said city shall constitute the common council.  *    *    *    * The mayor shall be the presiding officer of the common council, and shall have a casting vote in all cases, when a tie, but not otherwise." *Id.* § 28.    And " All by-laws and ordinances shall, within a reasonable time after their passage, be recorded in a book kept for that purpose, and signed by the presiding officer of the city." *Id.* § 76.

It will be observed that, in addition to the duties thus specially devolved upon the mayor, he is "to perform such other duties as the nature of his office and the interests of the city require."  This makes it proper that we should inquire into, and briefly refer to, the history of the office, and the nature of the duties of the officer, as formerly understood.  "MAYOR (*Præfectus urbis*), anciently *meyr*, comes from the *British miret, i. e., custodire;* or from the old *English* word *maier*, viz., *potestas*, and not from the *Latin Major*.  The chief governor or magistrate of a city or town corporation.  King Rich. I., *anno* 1189, changed the bailiff of *London* into a mayor; and from that example king *John* made the bailiff of *King's Lynn* a mayor *anno* 1204.   *    *    *    * Mayors of corporations are justices of the peace *pro tempore*.  *    *    *    * The powers and duties of a mayor, or other head officer of a corporation, depend, in general, on the provisions of the charters, or prescriptive usage of the corporation, or the express provisions of an act of parliament.  It is commonly one of his duties, as well as of his particular privileges, to preside at the corporate assemblies."  4 Jacobs' L. Dict. 264, 265.—2 Toml. L. Dict. 540.  "The chief or executive magistrate of a city. It is generally his duty to cause the laws of the city to be enforced, and to superintend inferior officers.  But the power and authority which mayors possess, being given to them by local regulations, vary in different places."  2 Bouv. L. Dict. 150.  "The chief magistrate of a city or

corporation." Bailey's Dict. "Originally an overseer, a bailiff. The chief magistrate of a city. In *America*, is the chief judge of the city Court," &c. Webst. Dict.

Except the judicial powers devolved upon the mayor by this statute, his duties, by virtue of his office of mayor, would, in our opinion, be of an executive and administrative character, but whether such as fall within that department of the government as established by articles 3, 5, and 6, of the constitution, is the next inquiry.

As it is expressly provided by the third article that "No person, charged with official duties under one of these departments, shall exercise any of the functions of another," &c.; and as it is averred that *Wallace* was elected mayor, not city judge by that name, it is necessary for us to determine whether his executive and administrative duties are to be classed in one of the great departments of the state government, for the reason that we have already signified, that certain of the "official duties" with which he was charged, fall within the judicial department.

If all the official duties, with which he was charged, are to be classed within the one or the other of those departments, then it is too clear, it appears to us, to require argument, that he had the right to exercise official duties in but one of the departments; and any attempt to require him to discharge duties, at the same time, in another of the departments of the government, would be inoperative.

In other words, if he was, as averred, elected to the office of mayor, the legal and appropriate duties of which are within one of these great departments, and of an executive and administrative character, and he should be required by statute, whilst acting in that capacity in the discharge of those duties, to exercise functions of a character falling within the judicial department, such statute would be simply invalid—one that he might, and should, disregard—just as an officer in the judicial department of the state might disregard any attempt to charge him with official duties of the legislative department. But if the executive and administrative duties with which he was officially charged, should not be considered as within either of the depart-

ments of the state government, because he was merely, in that respect, an officer of a municipal corporation, in that case he might appropriately discharge all those duties at the same time.

After much consideration, we are of opinion that the executive and administrative duties of *Wallace* were not such as come within those departments of the state government, as established by the constitution, and that he was, consequently, left free to be charged with official duties under either of the other departments; that he was so charged with, and took upon himself, the duties of a judicial character before referred to, not as incidental to his office of mayor, but as separate and independent duties; and that during the term for which he, undertook thus to discharge judicial functions, he was ineligible to the office of sheriff.

The first part of this conclusion is in consonance with the decision of the superior Court of the state of *Delaware*, in the case of *The State* v. *The Wilmington City Council*, 3 Harr. 294. By the constitution of *Delaware*, "No ordained clergyman, or ordained preacher of the Gospel of any denomination, shall be capable of holding any civil office in this state," &c. One *Hagany*, an ordained minister, was elected city treasurer of *Wilmington;* and, upon the matter being properly brought before the Court, it was held, in substance, that the office of treasurer of the city was not a civil office in the state, within the meaning of the constitution; that the word "state," as there used, meant the body politic; that the purpose of the constitution was to establish the principles of government for the community as a body politic—to establish a state government and to provide the mode of its administration; that in speaking of offices, such offices were undoubtedly meant as were designed for that purpose, either directly or indirectly; that a corporation office formed no part of the system of government; that the provision had reference to the political system then framed, to-wit, to state offices, and not to corporation offices.

The case at bar differs from the one above cited in this,

that here, duties were devolved upon the municipal officer, other than those having reference to the administration of the affairs of the corporation, not incidentally, but in such terms as created, for the time being, a separate, inferior Court—an incorporeal, political being, created for the purpose of administering justice judicially.  3 Bouv. Inst. 67. He was required to judicially administer the laws of the state in respect to misdemeanors, as well as the laws or ordinances of the city government.  If his administration of the laws had been confined to those of a municipal character, although his acts might have partaken of the nature of judicial decisions, yet such acts would not, in our opinion, have classed him with judicial officers under the constitution; the classification under that instrument properly including all such, and only such, officers as are clothed with general, not incidental, powers to judicially administer the laws of the state.   That he acted in a two-fold capacity is evident, not only from the duties devolved upon him, but from the fact that the evidence of his acts as a judicial officer were to be perpetuated by being made a matter of record, by himself, in proper books kept by him for that purpose (Acts 1857, p. 47, § 19), whilst his acts as a mere executive, corporation officer were kept in remembrance by being spread upon the corporation records, kept by an officer—a clerk provided for that purpose.  *Id.*, p. 48, § 20.   If a city judge should hereafter be elected, the first-named books would go into the hands of that officer, as his regular successor in judicial station, whilst the corporation books would remain under the control of future officers of the corporation—mayors, councilmen, and clerks.

Under this view, the whole controversy is reduced to a single proposition, namely: The statute conferring upon the chief officer of a city the authority to judicially administer justice, under the laws of the state, is, or is not, constitutional.  If it is constitutional, then *Wallace*, having voluntarily accepted position under that law, was, by that act, and by force of the constitutional prohibition, placed in a condition that his mind was left free to discharge judicial functions, for the term for which he accepted, without

being disturbed by seeking preferment, for the time being, in either of the other departments. If the statute, conferring judicial power, is unconstitutional, then a very grave question would arise, as to whether all his acts were not, in that respect, void.

It is clearly the duty of each of the great departments of the government to regard the action of the co-ordinate departments as being authorized by the constitution, unless there is a manifest infraction of that instrument. Measuring this statute by that rule, there was not so decided an excess of authority, by the legislative department, in the adoption of that statute, as would constrain us to pronounce it void. It is our duty to regard the whole statute as operative, if we can properly do so. This we are enabled to do by following the principles of construction laid down in the *Delaware* case above referred to, and, also, in the cases of *The State* v. *Hutt*, 2 Pike, 282; 3 Greenl. (Maine R.) 284; *Bamford* v. *Melvin*, 7 *id*. 14.

There was a motion made in this Court to dismiss the appeal. An act approved *March* 2, 1859, and declared to be in force from and after its passage, authorized the appeal. Acts 1859, p. 35. This case was decided in the Circuit Court, after the taking effect of that act.

We have been greatly aided in the investigation of the questions involved, by the able and ingenious arguments, both written and oral, of counsel on each side.

PERKINS, J.—The opinion of the Court, prepared by Judge HANNA in this case, is sufficient and satisfactory. I do not propose to write another; but simply to briefly notice the decisions of this Court bearing upon one or two of the questions in the pending cause. Its importance and its novelty, in this state at least, justifies me in so doing.

One of the questions in the cause, involves the relation of a city, in this state, to the state. Are the laws, enacted by the city, the laws of the state, and do the officers of the city, in administering her laws, act as officers of the state government? It seems to have been so supposed, so far

May Term,
1859.

WALDO
v.
WALLACE.

as there appears to have been any idea upon the point, in the case of *The City of Madison* v. *Hatcher*, 8 Blackf. 341; which case was silently followed in *The City of Indianpolis* v. *Blythe*, 2 Ind. R. 75.

Hence, in those cases, it was held that where the same act was an offense against the criminal laws of the state, and also against the by-laws of the city, the act could only be punished under the state laws, in the mode pre-scribed by the constitution; and that punishment, again by the city would put the party twice in jeopardy for the same offense. But the cases of *Bogart* v. *The City of New Albany*, 1 Ind. R. 38; *The Town of Indianapolis* v. *Fairchild*, id. 315, and *Levy* v. *The State*, 6 id. 281, took a somewhat different view of the question; and, finally, the cases of *Madison* and *Hatcher*, and *Indianapolis* and *Blythe*, *supra*, were wholly overruled by *Ambrose* v. *The State*, 6 Ind. R. 351.

In *The State* v. *Moore*, 6 Ind. R. 436, the Court held that where the state of *Indiana*, by her laws, made criminal an act which was also made criminal by the laws of the *United States*, the doing of the act within this state constituted an offense against both the *United States* and the state, two separate governments; that the single act thus constituted two offenses, one against each government, and that each government, by its own officers, might punish the act once, whereby the same act would be twice punished as two offenses, one against each government. And in *Ambrose* v. *The State*, *supra*, the same doctrine was applied to the government and officers of the state and the city; and it was held that each might punish, in its own mode, by its own officers, the same act, as an offense against each.

This settles the question that the mayor of the city, when acting as such, is not a state officer; and shows that, in acting, both as a mayor for the city, and a judge under the laws of the state, he acts in two capacities, and that the same act might, on the same day, be punished by him, once as mayor, acting for the city, and once as a judge, punishing for a violation of the laws of the state;

and that one of these prosecutions would be no bar to the
other.

It further shows that, though he would act in two capacities, or in two offices, but one of them would be an office under the state. It is as if the state should confer upon the district judge of the *United States* for *Indiana*, jurisdiction of causes arising under the laws of the state. Supposing this could be constitutionally done, and to be done, that judge would, undoubtedly, be a judicial officer of the state and of the *United States*. So the mayor is made, by the law, a judicial officer of the state and of the city; and if this can be done legally, then *Wallace* was, while mayor, a judicial officer of the state, and ineligible to the office of sheriff.

The constitution provides that the judicial power of the state shall be vested in such Courts as the legislature shall create, of which the Supreme and Circuit Courts shall be two; and it further provides that justices of the peace shall be elected, but not that they shall exercise judicial power.

It will be observed that the judicial power is vested in Courts, not in officers. An officer may not necessarily be a Court. A justice of the peace is not necessarily a Court. He is not a Court when elected, simply by virtue of his election, and is not vested, by his election simply, with judicial power. But if the legislature, after or before his election, vest judicial power in that officer, as such, the exercise of which is made the chief and permanent duty of his office, he thus becomes a Court.

A Court is a tribunal charged, as a substantive duty, with the exercise of judicial power; and a judicial officer is the person appointed to exercise that power. These definitions may not be, and it is admitted are, probably, not complete. But they are sufficiently so, for the purposes of this case. A judge will be none the less a judicial officer because some duties he may have to perform are administrative in their character; nor will an administrative become a judicial officer, simply because some acts which he may be required to perform may be, to some extent, judicial in their character.

May Term,
1859.

WALDO
v.
WALLACE.

The duties of *Wallace*, as a state officer, were substantively, indeed, were entirely judicial, were continuous for his official term, were discharged in the form and with the effect of judicial proceedings in the other Courts of the state.

A word as to the mode in which the city Court is created. The constitution, as we have seen, gives the legislature unrestricted power in the creation of Courts, and points out no mode of filling them with officers, except as to three, viz., the Supreme and Circuit Courts, and justices of the peace. Others, the legislature may create in such mode, and vest with such portion of the judicial power as, within the provisions of the constitution, is deemed advisable. The judges of these Courts may be created by election or otherwise. And the judges in such Courts will be judicial officers, under the disabilities of the constitution.

In this case, *Wallace* was a judicial officer under the state, was elected in a manner which, under the unrestricted power of creating Courts conferred by the constitution, the legislature might adopt, and he was ineligible to the office of sheriff.

The powers which are exercised by a city government are, it thus appears, superadded to those exercised by the state in the same locality. The people of towns and cities are governed that much more than are the people of the state generally. This is deemed a necessary incident to a dense population. The powers thus exercised by the city governments are specified in their charters, and none can be exercised beyond the specifications; and to guard against their stepping beyond, an appeal lies to the state Courts, as from the state to the *United States*. Sometimes the state, by charter, abdicates all power over a particular subject within the city limits, in favor of the city government. *Wood* v. *Mears*, at this term (1). And see *The State* v. *Graeter*, 6 Blackf. 105; *The City of Lafayette* v. *Cox*, 5 Ind. R. 38; *The City of Aurora* v. *West*, 9 *id*. 74; *The City of Lafayette* v. *Jenners*, 10 *id*. 70.

*Per Curiam.*—The judgment of the Circuit Court is reversed—that judgment being that the proceedings should be dismissed—and that Court is directed to overrule the motion to dismiss, and to hear and determine the case in accordance with this opinion.

May Term, 1859.

WALDO
v.
WALLACE.

*N. B. Taylor, J. Morrison, J. E. McDonald,* and *A. L. Roache,* for the appellant (2).

*H. W. Ellsworth, S. Colley, D. M'Donald,* and *A. G. Porter,* for the appellee (3).

(1) *Ante,* 515.

(2) Mr. *Taylor* submitted the following argument in behalf of the appellant:

The appellee was elected city judge, under the title of mayor. I shall, therefore, in this argument, use the term mayor in the sense of city judge; and I shall maintain the following propositions:

1. The office of mayor, to which the appellee was elected on the first *Tuesday* in *May,* 1857, for the term of two years, is a judicial office within § 16, art. 7, of the constitution of 1851.

2. The office of sheriff is not a judicial office, but is merely an administrative office.

3. The office of sheriff is an office of trust or profit under the state.

4. The resignation of the appellee could not render him eligible to the office of sheriff before the expiration of the two years for which he had been elected mayor.

If these propositions are correct, the error of the Circuit Court, in sustaining the motion to dismiss the proceeding, is established beyond all controversy.

*First.* The office of mayor, to which the appellee was elected on the first *Tuesday* in *May,* 1857, for the term of two years, is a judicial office within § 16, art. 7, of the constitution of 1851. The original power of judicature is in the whole people of the state. Const., art. 1, § 1.—1 R. S. p. 42. But the people of this state have vested the judicial power of the state "in a Supreme Court, in Circuit Courts, and in such inferior Courts as the General Assembly may establish." Const., art. 7, § 1.—1 R. S. p. 59.

This language is general and prospective, it embraces, besides the Courts named, all inferior Courts which may be, at any time in the future, established by the General Assembly, whatever the name or the extent of the jurisdiction, because it is not the extent of jurisdiction, but the nature of the power conferred that determines the question, and they are established by the General Assembly, under the power granted in the constitution, without which grant they could not be established.

The language of § 1, art. 7, of our constitution, is different from that of the first section of the fifth article of the constitution of *Illinois.* The decision in the case of *The People* v. *Willson,* 15 Ill. R. 388, is not, therefore, directly in point; still it has an important bearing on the question. The first section of the fifth article of the constitution of *Illinois* is as follows: "The judicial

power of this state shall be and is hereby vested in one Supreme Court, in Circuit Courts, in county Courts, and in justices of the peace: *Provided,* that inferior local Courts, of civil and criminal jurisdiction, may be established by the General Assembly in the cities of this state." In the same article it is provided that a judge of the Supreme Court shall be elected by the qualified electors of each grand division of the state, a circuit judge in each circuit, and a county judge in each county. The 11th section of the same article provides that no person shall be eligible to the office of judge of any Court in that state who is not a citizen of the *United States,* and who shall not have resided in that state five years next preceding his election in the division, circuit, or county in which he shall be elected. In the case of *The People* v. *Willson, supra,* the construction of this section came up for the decision of the Court. The question was, whether the defendant, who had been elected recorder of the city of *Chicago,* and who had not been a resident of the state of *Illinois* five years next preceding his election, came within the inhibition of the 11th section. The Court say: "The word 'division' is only applicable to the judges of the Supreme Court; 'circuit' is only applicable to the circuit judges; and 'county' is only applicable to county judges; and each provision has reference to the fact that these judges are respectively elected by the qualified voters in these specified localities. * * * If the constitution had simply provided that no person should be a judge of any Court in this state, unless he is a citizen of the *United States,* and had resided in this state five years next preceding his election, there would have been less room for construction, and more doubt of the eligibility of this respondent. In such a case, the only inquiry would be, is he eligible to the office of a judge of a Court in this state?"

This suffices to show that the question before the Court, and determined in that case, differed from the one involved in this case. There the question arose as to the application of the terms "division," "circuit," and "county;" here, the point to be determined is, what is a judicial office? In that case, it is decided that a justice of the peace is a judicial officer, and a recorder also.

In 7 Bac. (Bouv. ed.) 317, it is said that it seems the better opinion that a recorder of a town cannot make a deputy without a special grant or custom for that purpose, that office being a judicial one, relating to the administration of justice.

In the case of *The People* v. *Kane,* 23 Wend. 414, the office of police justice is held to be a judicial office. It is not the name, however, but the duties, as we shall see, that decides the character of the office.

In the case of *The People* v. *Willson, supra,* the Court say: "If the constitution had simply provided that no person should be a judge of any Court in this state, &c., the only inquiry would be, is he elected to the office of a judge of a Court in this state?" The only inquiry in this case, then, is, is the office of mayor, to which the appellee was elected on the first *Tuesday* in *May,* 1857, a judicial office?

The 16th section of the 7th article of the constitution of this state, declares that "No person elected to any judicial office shall, during the term for which he shall have been elected, be eligible to any office of trust or profit under the state, other than a judicial office." 1 R. S. p. 61.

This is a plain provision, and free from ambiguity. What shall be the rule of interpretation and construction? Shall it be strict or liberal? Shall we be

governed by the plain, obvious meaning of the words used, and by the evident
intention of the framers of the constitution, or not?

Judge STORY says: "In the first place, then, every word employed in the
constitution is to be expounded in its plain, obvious, and common sense, un-
less the context furnishes some ground to control, qualify, or enlarge it. Con-
stitutions are not designed for metaphysical or logical subtleties, for niceties of
expression, for critical propriety, for elaborate shades of meaning, or for the
exercise of philosophical acuteness or judicial research. They are instruments
of a practical nature, founded in the common business of human life, adapted
to common wants, designed for common use, and fitted for common under-
standings. The people make them, the people adopt them, the people must
be supposed to read them, with the help of common sense, and cannot be pre-
sumed to admit in them any recondite meaning, or any extraordinary gloss."
1 Story on Const., p. 322, § 451.

In the case of *Gibbons* v. *Ogden*, 9 Wheat. 188, MARSHALL, C. J., says:
"What do gentlemen mean by a strict construction? If they contend only
against that enlarged construction, which would extend words beyond their
natural and obvious import, we might question the application of the term,
but should not controvert the principle. If they contend for that narrow con-
struction which, in support of some theory not to be found in the constitution,
would deny to the government those powers which the words of the grant, as
usually understood, import, and which are consistent with the general views
and objects of the instrument; for that narrow construction which would crip-
ple the government, and render it unequal to the objects for which it is de-
clared to be instituted, and to which the powers given, as fairly understood,
render it competent, then we cannot perceive the propriety of this strict con-
struction, nor adopt it as the rule by which the constitution is to be expounded.
As men whose intentions require no concealment, generally employ the
words which most directly and aptly express the ideas they intend to convey,
the patriots who framed our constitution, and the people who adopted it, must
be understood to have employed words in their natural sense, and to have in-
tended what they said."

In regard to the interpretation of constitutions, the same rules apply which
govern in the interpretation of statutes. If a statute or constitutional provi-
sion is of doubtful import, it may be susceptible of two interpretations; one
more restricted or severe, the other more enlarged or equitable. Sedgw. on
Stat., p. 491. But if the language of the law clearly expresses its meaning
and intention, that intention must be carried out. *Id.* pp. 277, 284. "Where
the legislature has used words of a plain and definite import, it would be very
dangerous to put upon them a construction which would amount to holding
that the legislature did not mean what it had expressed. The fittest course, in
all cases where the intention is brought into question, is to adhere to the words
of the statute, construing them according to their nature and import, in the
order in which they stand in the act of parliament. The most enlightened and
experienced judges have, for some time, lamented the too frequent departure
from the plain and obvious meaning of the words of the act of parliament by
which a case is governed, and themselves hold it much the safer course to ad-
here to the words of the statute, construed in their ordinary import, than to
enter into inquiry as to the supposed intention of the parties who framed the
act." Smith on Stat., p. 690.

May Term,
1859.

WALDO
v.
WALLACE.

"The only rule," says Lord C. J. TINDALL, "for the construction of acts of parliament is, that they should be construed according to the intent of the parliament which passed the act." The rule is, as we shall constantly see, cardinal and universal, that if the statute is plain and unambiguous, there is no room for construction and interpretation. The legislature has spoken; their intention is free from doubt, and their will must be obeyed. It may be proper, it has been said in *Kentucky*, in giving a construction to a statute, to look to the effects and consequences when its provisions are ambiguous, or the legislative intention is doubtful. But when the law is clear and explicit, and its provisions are susceptible of but one interpretation, its consequences, if evil, can only be avoided by a change of the law itself, to be effected by legislative, and not judical action." "So, too," it is said by the Supreme Court of the *United States*, "where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction." Sedgw. on Stat., p. 231, and authorities cited.

The language, "no person elected to any judicial office," is plain and unambiguous. It is general and unlimited. It would scarcely have been possible to have made use of plainer and more comprehensive language, entirely free from all qualifying or restrictive words. No interpretation is required,— there is room for none, except the single term, "judicial office." The interpretation of that settled, there is no difficulty whatever; for the declaration is aimed not at some judicial office or offices, but against any person elected to any such office. And this is a substantive and independent provision. Smith on Stat., p. 711, § 576.

"Any," is altogether universal and indefinite; it applies to every judicial office, without distinction, from the highest to the lowest. Crabbe's Synon., p. 250.

The Court will not, therefore, make an interpretation contrary to the express letter of the provision; for nothing can so well explain its meaning as the precise words used by its framers. Smith on Stat., p. 651, § 505.—Leib. Leg. and Pol. Herm., p. 171, § 15.

The intention of § 16, art. 7, of the constitution, is manifest from its own reading, without resort to extrinsic circumstances. The motives or reasons which operated in the mind of the convention, and impelled it to the enactment of this section, are obvious.

A person who solicits and takes upon himself such an office, ought to hold it during the term for which he was elected. The incentive, so common, to attain one office in order to make it a stepping-stone to another, and, perhaps, more desirable and lucrative office, which oftentimes leads to abuses of the trust, is dangerous and ought to be checked. Experience and integrity in the discharge of judicial functions ought to be secured, and persons elected to such an office prevented, as far as possible, from converting it into a vehicle for electioneering purposes. But be this as it may, the intention to render any person elected to any judicial office ineligible, during the term for which he shall have been elected, to any office of trust or profit under the state, other than a judicial office, is expressed in a manner devoid of contradiction and ambiguity. There is, therefore, no room for interpretation and construction. Sedgw. on Stat., p. 295.—*Id.* pp. 260, 277.—Smith on Stat., p. 651, § 505. The people have spoken; their intention is free from doubt; and their will

must be obeyed. Sedgw. on Stat., p. 231. And there is no possible motive or reason which could have operated in the mind of the convention as a cause for the enactment of such a provision, which would not apply with as much, if not more, force to the lowest judicial office created by the General Assembly under the power given in the first section of the 7th article of the constitution, as to the highest named in the constitution; for the language of § 1, and the general and unlimited power given to the General Assembly to establish inferior Courts, utterly forbids such a narrow view. Such a construction would lead to the greatest of all possible absurdities. And every interpretation or construction which leads to an absurdity ought to be rejected. *Id.* p. 270.—Smith on Stat., pp. 631, 633, §§ 486, 488. Such a construction would give us two classes of judicial offices—one within, the other without, the 16th section of the 7th article of the constitution. This would surely be absurd and defeat the very language, object, and intent of the framers of the constitution. If, then, one construction or interpretation would lead to absurdity, the other not, we must adopt the latter; for that construction or interpretation which leads to the more complete effect which the convention had in view, is preferable. Smith on Stat., p. 633, § 488. The 16th section of the 7th article may also be viewed as a remedial provision. It is an innovation on the constitution of 1816. It was a question with the convention whether the prohibition should not be made to apply to all offices. The first proposition was as follows: "The state shall be divided into a suitable number of circuits, and a circuit judge shall be elected by the electors in each circuit, and shall reside therein; and shall hold his office six years, if he shall so long behave well; and no person elected to any office in this state shall be eligible to any other office of trust or profit in the state, during the term for which he was elected." Deb. Const. Con., vol. 2, p. 1735.

The object proposed by the advocates of this measure was to discourage office-seeking as a business, to compel·a person who accepted an office to hold it until the time for which he had been chosen expired; or, if he did not, to remain a private citizen until the expiration of the time for which he had been chosen, because of the evils experience had shown to arise from frequent changes, and the abuse of power, and the prostitution of official honor and integrity on the part of those who sought and accepted a particular office merely as a means of getting another and better, by means the most certain and speedy. But the provision was ultimately confined to persons elected to judicial offices, without limitation, as being those in which the people at large were more deeply interested, and which, therefore, required the strongest checks and guards. If viewed, therefore, as a remedial provision, it should be construed largely and beneficially, so as to suppress the mischief and advance the remedy. Sedgw. on Stat., pp. 41, 359.—1 Story on Const., p. 304, § 429. We are not, however, at liberty to go beyond the just and ordinary sense of its terms. But there is no necessity for so doing. They are broad and comprehensive enough without, as has already been shown. They are general and unlimited, universal and indefinite, as applied to the subject-matter—"any judicial office." They comprehend and embrace the whole class.

What, then, is a judicial office?

In 7 Bacon's Abridgement (Bouv. ed.), p. 280, "Judicial offices are" defined to be "those which are exercised in the administration of the law." By this

we understand that they are offices exercised in deciding, determining, speaking, or pronouncing the law. Taking this as a correct definition, a judicial office is an office which is exercised in the administration of the law. Therefore, no person elected to any office exercised in the administration of the law, shall, during the term for which he shall have been elected, be eligible to any office of trust or profit under the state, other than an office exercised in the administration of the law. "No person elected to any judicial office."—This evidently means any judicial office in the state, not abstractly considered, but any such office in any locality in the state, be it city, county, district, or circuit; that is, any judicial office not without the bounds of the state—any judicial office at all concerned in the administration of the laws of the state. "Under the state," applies to the office of trust or profit from which the person elected to any judicial office is excluded during the term for which he shall have been elected. Now, that the office of mayor or city judge was, and is, an office in the state—one created, and its powers and duties prescribed, by the General Assembly, cannot be denied. That the mayor's or city judge's Court is also established by the General Assembly, and its powers and duties defined by the General Assembly; and that the General Assembly has conferred judicial power on the mayor, made him a judge, not merely a police judge, but clothed him with civil and criminal jurisdiction beyond simple violations of municipal ordinances, is equally true. Acts of 1857, p. 46, §§ 18, 19.

The mayor's or city judge's Court is, therefore, an inferior Court established by the General Assembly in the state; and it is a Court of record, for he is required to keep a record of his proceedings. 7 Blackf. 272. It is true, that, primarily, a mayor is the executive officer, only, of a city; and this, Judge PERKINS has correctly stated in *Powell's* case, *Daily Sentinel, August* 28, 1858. He says: "The mayor of a city is not necessarily, scarcely indeed, properly, a judicial officer. His appropriate duties are executive, analogous to those discharged by the governor of the state." But his Honor, after thus stating what a mayor is, considered only as mayor, says: "He may be empowered to act in a judicial character also. He may be constituted a Court. He is so by the city charter. He is made judge of a city Court, with the general powers, and governed by the rules of practice, of a justice of the peace; and when he acts judicially, he acts under those general rules."

It is true, a municipal corporation is a kind of *imperium in imperio*, a government within a government; so is a township, county, &c. It is created and empowered to act by the supreme legislative power of the state. It is not, however, independent of, but subservient to, the creator or sovereign. It is part and parcel of the machinery of the state, to carry out its objects and subserve its purposes—to preserve order and protect property. It would, then, be strange indeed if the General Assembly could not establish a Court therein, provide for such Court a judge, clothe him with judicial power and authority; and when thus established or constituted, he is a Court; he is made judge of a Court. Judicial power and authority is the very essence of a judicial office. The one cannot exist without the other. The power and authority are inseparable from the office; the office possesses or confers the power and authority. But further, a Court is a place where justice is judicially administered. 3 Blacks. Comm., p. 23. It is a kind of incorporeal being, which can be seen only in the person of the judge, and felt in the exercise of his func-

tions. In common parlance, the judge alone is the Court. 2 Bac. (Bouv. ed.), p. 616. There cannot be a Court without a judge. 3 Blacks. Comm., p. 25. "Judge" and "justice" are convertible terms; and all officers elected to administer the law, call them by what name you please, are "judges" or "justices." 2 Toml. L. Dict. 281, tit. Judge.—*Id.* 317, tit. Justices.

As already stated, a judicial office is an office exercised in the administration of the law, or in the discharge of judicial functions—one in which some part of the judicial power of the state is vested; for it cannot be said that all the judicial power of the state is vested in any one, or in any number less than the whole. Const., art. 7, § 1.—7 Bac. (Bouv. ed.), p. 279.—2 Toml. L. Dict. p. 665.

The judge or justice administers the law, that is, speaks the law, determines questions at issue in a Court of law, or decides upon the rights of others by authority of law. 3 Blacks. Comm., p. 25.—15 Ill. R. 391.—1 Bouv. L. Dict. 724. The judge, justice of the peace, mayor, or whatever other name the law may confer, is, therefore, a judicial officer, his office a judicial office, and the power and authority with which he is clothed, or which he exercises, judicial power. Const., art. 7, § 1.—3 Blacks. Comm., p. 25.—2 Toml. L. Dict. 281. —*Id.* p. 317.

But § 1, art. 7, of the constitution, vests the judicial power of the state in the Courts named, "and in such inferior Courts as may be established by the General Assembly." The office of judge or justice of any such inferior Court so established must, then, be a judicial office within the 16th section of the same article, because such judge or justice of any such inferior Court is empowered by the General Assembly, under the constitution, to administer the law—to determine questions at issue, or decide upon the rights of others, within his jurisdiction. The term "any judicial office," then, as used in the 16th section, cannot be restricted to any particular judicial office, but must include not only judges of the Courts named, but also the judges of all such inferior Courts as may at any time be established in the state by the General Assembly; as, for example, judges of Courts of Common Pleas, and mayors or city judges—that is, all offices relating to the administration of justice, or the exercise thereof. This seems an honest, faithful, and *bona fide* construction, having common sense for a guide—one that cannot be avoided, and a conclusion that cannot be escaped, without resorting to sophistry. Now, the General Assembly of the state of *Indiana*, by a general law, entitled "An act to repeal all general laws now in force for the incorporation of cities," &c., approved *March* 9, 1857, established an inferior Court in every city in this state, called a mayor or city judge's Court. Acts of 1857, p. 46, § 18. The words mayor or city judge are used in the act in reference to the Court as synonymous. *Id.* p. 47, § 19. The act provides that the mayor shall be elected for the term of two years. A city judge is not elected unless the council, deeming it for the best interest of the city, cause one to be elected. *Id.* p. 44, § 9. The election of a city judge, by that name, distinct from the mayor, depends upon the action of the common council. As a separate and distinct officer, he cannot be called into being except by the action of the common council. Not so the mayor or city judge. But if the council deem it expedient for the best interest of the city to cause that separate functionary, called a city judge, to be elected, he must be elected at the general election at

which the mayor is also elected, and serves for the same length of time, viz., two years. *Id.* p. 44, § 9, and p. 46, last clause of § 18.

If the council does not order the election of a city judge, at the general election at which the mayor is elected, the mayor is elected mayor or city judge of the mayor's or city judge's Court for the term of two years. (See same section and pages last cited.) It is not in the power of the council to order the election of that separate functionary simply styled "city judge," during the continuance in office of the mayor for the term for which he was elected. *Ibid.* In the absence of such order and election, then, the mayor is not elected merely as mayor or the chief executive officer of the city. He is elected mayor or city judge. In the language of PERKINS, J., *supra*, "He is made judge of a city Court, with the general powers, and governed by the rules of practice, of a justice of the peace." The duties of the mayor are set forth in § 18, p. 46, Acts of 1857.

The first specified are those which properly belong to the mayor as the chief executive or governor of the city, except the conservation of the peace, which is common to all judicial officers. Const., art. 7, § 15.—1 R. S. p. 60. These are additions and not subtractions. How, then, can they detract from his judicial office, or his judicial power and authority? It is not easy to perceive. But it may not be amiss to inquire somewhat into this union of power and its effect. In *Watkins* v. *Holman*, 16 Pet. 60, it is said, "In some cases it is difficult to draw a line that shall show with precision the limitation of power, under our form of government. The executive, in acting upon claims for services rendered, may be said to exercise, if not in form, in substance, a judicial power. And so a Court, in the use of a discretion essential to its existence, by the adoption of rules or otherwise, may be said to legislate. A legislature, too, in providing for the payment of a claim, exercises a power in its nature judicial; but this is coupled with the paramount and remedial power." In the case of *Yates* v. *Lansing*, 5 Johns. 297, KENT, C. J., says: "The allowance of a writ [*habeas corpus*] in vacation, is not a judicial act. It is merely analogous to the case stated in *Green* v. *The Hundred of B.* (1 Leon. 323), where it was held, that an action on the case lay against a justice of the peace, for refusing to take the oath of the party robbed, because, in such case, he did not act as a judge, but as a particular minister appointed by the statute of *Elizabeth*." Many other examples might be cited, where the law imposes duties upon, or authorizes their performance and they are performed by, persons holding judicial offices, which are not in their nature judicial, and which have never in any degree been supposed to diminish or interfere with the judicial office. But are these executive duties inconsistent with the exercise of his judicial functions?—and does the union of the two in him invalidate the whole, under the third article of our constitution? 1 R. S. p. 48. If the decision in the case of *The State of Delaware* v. *The Wilmington City Council*, 3 Harr. 294, is correct, they do not. For, according to that decision, the office of treasurer of a public corporation, such as the city of *Wilmington*, was not a civil office in the state of *Delaware*, under that clause in her constitution, which declared a clergyman ineligible to any "civil office in the state." The office of mayor, then, as the chief executive officer of a city only, would not come within the purview of the third article of the constitution; and the executive duties are not inconsistent with the discharge of judicial power, and

leave his judicial office separate and distinct from the other, and clearly within
the prohibition contained in § 16, art. 7, of the constitution. For the judicial
office must be created by the General Assembly under the power contained in
the first section of art. 7, or it cannot exist. No power to establish a Court
can, elsewhere, be found. The power to establish the Court carries with it the
power to provide the judge. And when the Court is thus established, accord-
ing to every mode of correct reasoning, the judge of such Court is as much a
judicial officer, and his office as much a judicial office, as that of a supreme or
circuit judge; because the judicial power of the state is vested in the Supreme
Court, in Circuit Courts, and in such inferior Courts as the General Assembly
may establish. Const. art. 7, § 1.—1 R. S. p. 59.—2 Ark. R. 282.

If this view be correct, it furnishes the key to the solution of the question,
reconciles what is said to be the conflicting powers, and sustains the validity
of the mayor's Court beyond all question.

The act further provides that the mayor shall hold a city Court; that he
shall have exclusive jurisdiction of all prosecutions for violations of the by-
laws and ordinances of the city, within the limits of the city, the jurisdiction
and powers of a justice of the peace, in all matters civil and criminal arising
under the laws of the state, and for crimes and misdemeanors, his jurisdiction
shall be co-extensive with the county in which the city is situate. Acts 1857,
p. 46, § 18. This is sufficient to make the mayor a judicial officer, and his
office a judicial office; and these powers are not incidental, they are principal.
They are conferred by the statute, and he exercises them as mayor or judge of
the city Court.

The case of *Morrison* v. *McDonald*, 21 Maine R. 550, does not, therefore,
apply. There, a city judge was elected, and a recorder also. The duty of
the recorder, by the statute, was to act as clerk of the city Court, but in the
absence of the regularly elected city judge, he was authorized to act as judge
*pro tempore*. The recorder was not, therefore, elected city judge, but clerk
only. He was no more elected judge than would be the prosecutor or any
other member of the bar, if by appointment of the circuit judge, he should
sit on the circuit bench and hold Court *pro tempore* in the absence of such judge.
But admit, for the sake of the argument, that the vesting of executive and
judicial power in the appellee, was in contravention of the third article of the
constitution, what is the result? He was elected mayor, and by that title city
judge. Could he not act as city judge and decline the duties imposed upon
him as mayor only, according to the ruling of the judges in 2 Dallas, 409?
But suppose he did not, and discharged both, did this reduce his judicial office
to a mere nothing? Surely not. It could have no more effect on his judicial
office, than would the compliance of the circuit judge with the provisions of
the statute (2 R. S. p. 10, § 8) which requires him to examine the clerk's
offices in his circuit, see if the books and papers are properly kept, and make
out and file a sworn report with the several county auditors. And no one
would, for a moment, maintain so absurd a position as that the performance of
that executive or administrative act would make him less than a judge, or ren-
der him incapable of holding and exercising his judicial office. Besides, the
appellee was elected to the office of city judge, and accepted and discharged
the duties of the office until he saw fit to resign. Can this Court inquire into
the validity of the office collaterally, or would the appellee be permitted to
justify his course on the ground that the law which created, and under which

May Term,
**1859.**

WALDO
v.
WALLACE.

he was elected to and exercised his office, was void? By our statute, the mayor is not elected and commissioned as a justice of the peace. He is elected mayor or city judge of a separate and distinct Court. The case of *The State v. Maynard*, 14 Ill. R. 419, does not, therefore, in any respect, affect the question. There, the mayor could exercise no judicial power except as justice of the peace. The Court say: "Except as justice of the peace, it is very clear that the mayor could exercise no judicial power. There can be no well grounded pretense that he was a judge of the Supreme Court, Circuit Court, or county Court, or that he was the judge of an inferior local Court, established by the General Assembly under the proviso to the first section quoted. Under that proviso, no attempt has been made to establish a Court in the city of *Rockford*." Here the mayor exercises judicial power as mayor or judge of the city Court, a separate tribunal; an inferior Court established by the General Assembly by authority of the constitution. He does not exercise judicial power as justice of the peace; therefore, § 22, art. 4, of the constitution, is not violated. Moreover, it is apparent that if the common council should order a city judge to be elected, his office would be a judicial office. This being true, how can it be different when the mayor is elected. If, in the one case, it is a judicial office, it surely must be so in the other. And that there cannot be a judicial office created by the General Assembly unless by the power contained in the first section of article 7, of the constitution, and without its being a judicial office within the 16th section of the same article, has been conclusively shown. The office of mayor, to which the appellee was elected on the first *Tuesday* in *May*, 1857, for the term of two years, is, then, a judicial office within the 16th section of art. 7, of the constitution, which declares that "no person elected to any judicial office, shall, during the term for which he shall have been elected, be eligible to any office of trust or profit under the state, other than a judicial office." 1 R. S. p. 61. This conclusion seems to be fair, legitimate, and unavoidable.

But it has been insisted by the appellee, and may be again, that justices of the peace are not judicial officers within the 16th section of art. 7; therefore, mayors are not. Is it true that justices of the peace are not within that section? The constitution provides for the election of a competent number of justices of the peace, and declares that "their powers and duties shall be prescribed by law." 1 R. S. p. 60, § 14.

Now it is unnecessary to refer to the fact that from the 34th Edw. III., to the present time, justices of the peace have been judges of record, and their Courts Courts of record (3 Bac. Abr. 396.—7 Blackf. 272), or to insist upon the, at least *prima facie*, case made by that fact connected with their being named in the articles on the judiciary, and to the additional one, that in § 22, art. 4, of the constitution (1 R. S. p. 52), it is declared that no local or special law shall be passed regulating the jurisdiction and practice of justices of the peace; it is sufficient that the constitution declares that their powers and duties shall be prescribed by law, and that they have been so prescribed. The law has made them Courts, made them judges of Courts, given them judicial power, and imposed upon them judicial duties. 2 R. S. pp. 449, 505. The General Assembly, in whom the power is vested, has made them inferior Courts, and by virtue of the power in § 1, art. 7, of the constitution, vested in them a part of the judicial power of the state. The office of justice of the peace is, then, clearly

a judicial office, within the 16th section of art. 7, as much so as that of a supreme or circuit judge. 2 Ark. R. 282.

*Second.* The office of sheriff is not a judicial office, but is merely an administrative office.

At common law, it is said, the office of sheriff was of a mixed nature—ministerial and judicial. 3 Salk. 322.—3 Toml. L. Dict. 480.—8 Bac. Abr., Bouv. ed., tit. Sheriff, let. D., p. 688. But this is hardly correct, for in the Courts Baron and Courts Leet, every suitor of the manor gave his voice as a juror. 3 Blacks. Comm. 33, 34.—4 *id.* 273.—2 Johns. 71. And Lord ERSKINE, in his celebrated argument on the rights of juries, says: "On appeals from these domestic jurisdictions to the county Court, and to the town (circuit) of the sheriff, or in suits and prosecutions originally commenced in either of them, the sheriff's authority extended no further than to summon the jurors, to compel their attendance, ministerially to regulate their proceedings, and to enforce their decisions. And even where he was specially empowered by the king's writ of *justicies*, to proceed in causes of superior value, no judicial authority was thereby conferred upon himself, but only a more enlarged jurisdiction on the jurors." Goodr. Brit. El., p. 658. In this he is supported by *Blackstone.* 3 Blacks. Comm., p. 36. *Blackstone* says: "The county Court may also hold plea of many real actions, and of all personal actions to any amount, by virtue of a special writ called a *justicies;* which is a writ empowering the sheriff for the sake of dispatch, to do the same justice in his county Court, as might otherwise be had at *Westminster*. The freeholders of the county are the real judges in this Court, and the sheriff is the ministerial officer." Be this as it may, however, under our constitution and laws the office of sheriff is only an administrative or ministerial office. Const., art. 3, § 1.—*Id.*, art. 6, § 2.—1 R. S. pp. 48, 58.—2 Ark. R. 282.

But it has been urged by the appellee, that the sheriff acts judicially in writs of *ad quod damnum.* This is not the case. In such proceeding he acts merely as the servant of the Court, under a writ issued by order of the Court, summons the jury by command of the writ, ministerially regulates their proceedings, and returns the inquest into Court. 2 R. S. pp. 189, 191, §§ 687, 696.

It is taking the definition too large, to say that every act where the judgment is at all exercised, is a judicial act. 3 Burr. 1262.

In *Tillotson* v. *Cheetham,* 2 Johns. R. 63, is is decided that the execution of a writ of inquiry is an inquest of office, and the officer who presides acts ministerially and not judicially. At p. 71, KENT, C. J., says: "The inquisition is merely an inquest of office, and the act of presiding is ministerial and not judicial, notwithstanding there are some loose sayings to be gleaned from the books, that seem to countenance a contrary opinion. The sheriff gives no judicial decision upon the law, and concluding to a judgment, any more than what might be requisite in the performance of any ministerial act. The reason given why the jurors cannot be challenged on a writ of inquiry of damages is, because it is only an inquest of office, and the sheriff does not act as judge." 1 Roll. Abr., tit. Trial, P.

A judicial office relates to the administration of justice, or the actual exercise thereof; it gives the power to decide—to determine. A ministerial office gives the officer no power to judge of the matter to be done, but requires him to obey the mandates of a superior. 2 Blacks. Comm. 25.—7 Bac. Abr. (Bouv. ed.), p. 280.

May Term,
1859.
———
WALDO
v.
WALLACE.

The office of sheriff is not, therefore, a judicial office, but is merely an administrative or ministerial office.

*Third.* The office of sheriff is an office of trust or profit under the state.

That the office of sheriff is an office of trust or profit is too plain to require argument or authority. That it is an office under the state, within § 16, art. 7, of the constitution, is evident from § 2, art. 6, of the constitution. 1 R. S. p. 58.—*Id.* p. 223, § 1.

*Fourth.* The resignation of the appellee could not render him eligible to the office of sheriff before the expiration of the two years for which he had been elected mayor.

In discussing this proposition, the rules relating to interpretation and construction already stated and referred to, apply in their full force. The language of § 16 is positive. "No person elected to any judicial office shall, during the term for which he shall have been elected, be eligible," &c. That is, the person elected to such office shall not be eligible during the whole period of time for which he shall have been elected. The word "term" is here used in the sense of time, as is clear from what follows—"for which he shall have been elected"—that is, chosen or appointed.

The prohibition relates and attaches to the person elected to any judicial office, and it extends or continues during or until the expiration of the time for which he was elected. It is the time for which he was elected, and not the time that he may continue to hold and exercise the judicial office, that is spoken of; and it is declared that the ineligibility shall continue as long as the time lasts for which he was elected. The office, or the power and right to exercise the office, may be determined by resignation or otherwise, before the expiration of the term or time for which he was elected; but does that annihilate the residue of the time for which he was elected? Not at all. It still exists, and only expires with the time—two, four, or six years—for which he shall have been elected. *Biddle* v. *Willard*, 10 Ind. R. 62.

Now the term for which the appellee was elected mayor, did not expire until the first *Tuesday* in *May*, 1859, and until his successor was elected and qualified.

He was not, then, eligible to the office of sheriff when he was elected at the general election for the state, on the second *Tuesday* in *October*, 1858.

(3) Counsel for the appellee submitted the following argument:

The first question presented is—

Was *Wallace*, when mayor, a judicial officer as contemplated by the constitution?

The constitutional provisions relied upon by the appellant's counsel are as follows: "No person elected to any judicial office, shall, during the term for which he shall have been elected, be eligible to any office of trust or profit, under the state, other than a judicial office." Const., art. 7, § 16. And again: "The judicial power of the state shall be vested in a Supreme Court, in Circuit Courts, and in such inferior Courts as the General Assembly may establish." Const., art. 7, § 1.

It is from the clause last cited, taken in connection with certain portions of the "act for the incorporation of cities," providing, in the contingency of a failure to elect a city judge, for the discharge of his duties by the mayor, and defining such duties as analogous with those assigned to justices, that the con-

testant seeks to establish the mayoralty as a "judicial office," and its head as a "judicial officer," within range of the constitutional prohibition.

Even admitting the position claimed, it is contended by the contestee that the argument deduced from the performance of analogous duties, is destroyed by the futility of attempting to introduce justices of the peace to the circle of such judicial power as seems contemplated by the constitution. If entitled to admission, it must be because they meet the constitutional requirements. But they are surely not judges of a "Supreme" or "Circuit" Court, nor, as we think equally clear, of any "such inferior Court as the General Assembly may establish."

However it may be elsewhere, in this state the office of a justice of the peace, as well as the mode of election to and duration of its term, is, in fact, directly provided by the constitution, leaving to the General Assembly no agency in its creation, and only a right to prescribe the powers and duties of a Court, if such it be, which the constitution has established. The language is (§ 14, art. 7, of the constitution), "A competent number of justices of the peace shall be elected by the voters of each township in the several counties. They shall continue in office four years, and their powers and duties shall be prescribed by law." And it may be remarked in this connection, that the Supreme and Circuit Courts, as to the number of their judges, manner of election, and duration of term, are provided in the same constitution (see §§ 2, 3, 4, 8, 9, of art. 7), in language almost precisely similar with that creating justices of the peace, with powers of the same kind vested in the General Assembly to prescribe the nature and extent of jurisdiction. They are all, therefore, equally established by the constitution.

It results, therefore, that the constitution has established the distinct offices of supreme judge, circuit judge, and justices of the peace, and yet, in defining the "judicial power" of the state, has expressly admitted to it only the former, to the necessary and direct exclusion of the latter.

Nor do these views derogate at all from the true position and efficiency of justices. They can still discharge all the important duties committed to their care; their Courts may continue to be those of record; and they, as heads of the same, to be, not only in common parlance, but in fact, judicial officers, without possessing the peculiar qualifications demanded for admission into the circle of judicial power, as defined and restricted by constitutional provisions.

But to return to our main argument. What are the primary and natural duties of a mayor? We answer—

I. That his duties are not, in general acceptation, of a judicial character; but, on the contrary, are wholly ministerial.

Lexicographers define a mayor as the chief magistrate of a corporation; and a magistrate—from the *Latin, magistratus*—as one holding public authority. *Vide* Webster, Johnson, and others. *Magistratus est qui præsit*—one who presides. Cicero de Legibus. As applied to municipalities, this officer was called by the *Romans, Prætor Urbanus,* and sometimes *Major Urbanus*—city ruler or elder; from which our term of mayor seems to be derived, though referred by others to the *Amoric, mear* and *Welsh, maer,* signifying to keep or guard. *Richard* I. of *England* changed the bailiffs of *London,* A. D. 1189, to mayors, with administrative power only; and the title of mayor, with the same restricted power, had become a common one in the time of *Bracton.*

See, in general, Cicero's Roman Law, book 3, chap. 1; Adams's Roman Antiquities; Ainsworth's Dict.; Cam's Britannica, 325; Bracton's Folio, 57.

II. Nor are the primary and essential duties of mayors, in this state, of a judicial character.

It is provided (see act for incorporation of cities, approved *March*, 1857, §§ 18, 28), that mayors "shall preside at meetings of the city council and recommend measures for its consideration; see that state laws and the corporation ordinances are faithfully executed; exercise supervision over inferior officers; act as conservators of the peace; have the custody of the corporate seal, and take and certify under the same the proof of deeds and other instruments of writing; sign commissions, licenses, and permits, and perform such other duties as the nature of their office and the interests of the city require." All of which duties are executive or ministerial in their nature.

III. Nor are such judicial acts as may be performed within the state by mayors, of the essence of or dependent upon the mayoralty, but wholly incidental and contingent.

The act for the incorporation of cities (see Acts of 1857, p. 44, § 9), contemplates the two distinct offices of mayor and city judge—the latter depending upon the will of the common council; and further, that the exercise of any judicial power by the mayor, shall be contingent upon the non-election and qualification of said judge. No judge having been chosen, the mayor may perform his duties; but with the election and qualification of such judge, all judicial action by the mayor ceases, not to be resumed even during the absence of said judge, who, in such case, must deposit his docket with some justice. Acts of 1857, pp. 46, 47, §§ 18, 19. Nor are these separate offices convertible at the pleasure of their holders, for while the mayor may, in the case provided, act as judge, the latter cannot, in any contingency, discharge the primary and essential duties of the mayor.

IV. The exercise of judicial power by strictly executive officers is no rare occurrence, nor does it constitute the actors "judicial officers," within the meaning of the constitution.

Cases of this kind are numerous. Sheriffs are empowered to try writs of *ad quod damnum*, and for that purpose may impannel and charge a jury and receive its verdict. 2 R. S. p. 188, art. 41. Clerks of the Common Pleas and Circuit Courts may take recognizance of bail (*Id.* p. 132, § 421), which shall have the effect of a confessed judgment. *Id.* p. 133, § 427. Coroners may summon and hold Courts of inquest, recognize witnesses, swear and charge a jury, and perform other judicial acts (*Id.* chap. 7); and the various boards of county commissioners throughout the state, upon which, in the express language of the constitution (see art. 6, § 10), the General Assembly can confer only "powers of a local, administrative character," may yet (1 R. S. p. 272, § 19) assemble as a Court, "summon witnesses, punish contempt, coerce the payment of costs, and try and determine cases of contested elections," in all of which they are to be "governed by the rules of law obtaining in the Circuit Court." Jurors, also, by express constitutional enactments (art. 1, § 19), are made, in criminal cases, judges of both law and facts; and it has been decided that judges of elections exercise judicial functions. *Rail* v. *Potts*, 8 Humph. 225. Yet it cannot be successfully contended that all or any of the acts enumerated, constitute the actors judicial officers, as contemplated by the constitution.

V. Nor are judicial decisions wanting in support of our position.

In the *Powell habeas corpus* case, before his Honor, Judge PERKINS, in vacation, and reported in *The Indiana State Sentinel*, under date of *August* 28, 1859, it is held that "the mayor of a city is not necessarily, scarcely indeed, properly, a judicial officer. His appropriate duties are executive, analogous to those discharged by the governor of the state." Nor should it be forgotten that this opinion was pronounced by the learned judge referred to, at a time when the act of 1857, for the incorporation of cities, from which contestant so strenuously argues the judicial nature of the mayoralty, was in full force, the act having been accepted by the common council of the city of *Indianapolis*, and the decision involving an ordinance adopted under it by that council.

The case of *Morrison* v. *McDonald*, 21 Maine R. 550, 557, is an important one, establishing the positions that judicial officers must be such to a general intent, and that the office cannot be inferred from a mere exercise of judicial authority.

The following is an abstract of the case:

It is provided by the constitution of the state of *Maine*, art. 9, § 6, that "the tenure of all offices which are not, or shall not be otherwise provided for, shall be during the pleasure of the governor and council." And again, art. 6, § 4, that "All judicial officers, except justices of the peace, shall hold their offices during good behavior, but not beyond the age of seventy years."

*Morrison* had been appointed for four years, and during the pleasure of the governor and council, as recorder of the city Court of *Bangor*, of which *McDonald* was municipal judge.

The term having expired, one *Prescott* was appointed as successor, to whom *Morrison* refused to deliver up the office, disobeying the mandamus of *McDonald*, who thereupon committed him to jail.

The tenure of the office of recorder, as to duration, was not prescribed in the act establishing the office.

It was contended by *Morrison* that the governor had no power to remove him and appoint a successor; that by the city charter he was fully authorized to act in the place of judge, in his absence or death, in all criminal cases, with power to try, judge, and punish; and that he was in fact a judicial officer, whose term extended, under the restrictions mentioned, during good behavior.

The case came up on error in the Eastern District Court. WHITMAN, C. J., gave the following opinion:

"We cannot bring our minds to the conclusion that a recorder is, in the sense contemplated in the constitution, a judicial officer. It seems that the framers of that instrument had in view those who, to a general intent and purpose, were such, and not those who were incidentally and casually intrusted with the exercise of some attribute of a judicial character.

"The instances are numerous in which individuals are expected, in connection with their chief duties, characterizing the duties of their appointment, which in the main is in no wise judicial, to exercise, as incident thereto, casually, some judicial power. Take, for instance, the senate of the state. That body has judicial powers in cases of impeachment, but it never occurred to any one that its members were to be deemed judicial officers. The great body of their power is wholly foreign to anything of a judicial cast, and they never could have been viewed as judicial officers. Auditors and masters in chancery, in connection with their ministerial duties, perform sundry acts of a

judicial nature; so do the assessors of taxes of our municipal corporations, and commissioners on insolvent estates, and commissioners to adjust controversies for the damage occasioned by flowing lands, under the act concerning mills, and to make partition of real estate; and in this connection, the case of the county commissioners may well be referred to, since it has been deemed proper to authorize an appeal in all cases in which there can be any litigation before them between parties, to this Court, when whatever may be done in the matter of such appeals must be admitted to be of a judicial nature."

The case of *The Commonwealth* v. *Dallas*, (reported in 4 Dallas, 229, 231, and still more fully in 3 Yerger, 300,) is equally in point.

This case arose under a provision of the constitution of *Pennsylvania*, "that no person holding or exercising any office of trust or profit under the *United States*, shall, at the same time, hold or exercise the office of judge, &c.,   *   * or any other office in this state, to which a salary of the state is annexed."

Under this constitution, the defendant was, in fact, discharging, at the same time, the duties of attorney general of the *United States* and recorder of the city of *Philadelphia*. Application was made to the Supreme Court for leave to file an information, in the nature of a writ of *quo warranto*, to inquire by what authority he exercised the duties of the latter office. But it was agreed that the merits of the case should be discussed and declared upon this preliminary motion.

In support of the motion, it was argued that the recorder performed judicial functions by provision of the city charter, and did so "not as a ministerial agent of the corporation, but that he was, in fact and law, a judge, within the meaning of the constitution, and the interpretation of the most authoritative writers."

In opposition, it was premised that the constitution did not include in its prohibition any other than state officers; that the recorder was not an officer of the commonwealth or state, but an officer of the corporation; and that, according to the letter, the spirit and meaning of the constitution, he was not a judge.

A wide array of authority was presented, which will be found cited in the text, and the judges declaring that the question was of too much importance to be decided without deliberation, directed a *curia advisare vult*, until the next term, when the unanimous opinion of the Court was delivered by SHIPPEN, Chief Justice—

"That although the recorder of the city of *Philadelphia* possesses some powers and performs some duties of a judicial nature, he is not a judge within the meaning of the 8th section of the 2d article of the constitution."

VI. And in this connection, as bearing directly upon the question as to what extent *Wallace*, either in his capacity as mayor, or the contingent discharge of the duties of city judge, can be considered as a judicial officer, or, in fact, an officer of any kind under the state, within the meaning of the constitution, we refer to the case of *The State* v. *Wilmington City*, 3 Harr. 295, where, upon principles similar to those we maintain, it was decided that the office of city treasurer was not a civil office, within the range of certain constitutional prohibitions.

The facts are as follows:

*Hagany*, an ordained and officiating clergyman, had been elected treasurer of the city of *Wilmington*, in violation, as was contended, of the following provision of art. 7 of the constitution of *Delaware:* "No ordained clergyman, or

ordained preacher of the Gospel, of any denomination, shall be capable of holding any civil office in this state."

But in deciding that the office of city treasurer was not a civil office, in contemplation of the clause referred to, which decision was sustained in separate opinions of all the judges, Justice HARRINGTON remarks:

"The principle is, that ordained clergymen shall not be employed in administering the government. It doubtless grew out of a wise determination to keep the affairs of the church separate from affairs of the state. Is this principle fully recognized in excluding clergymen from all offices of the government, properly speaking, or does it require to be extended to offices held under public corporations, and not held under or comprising any part of the state government? The business of the convention was to establish a state government, and to provide the mode of its administration. In speaking of offices, such offices were undoubtedly meant, as were designed for this purpose either directly or indirectly. But the constitution nowhere descends to notice a corporation officer. Such an office forms no part of the state government. It is perfectly immaterial for all the purposes of state government, whether the city of *Wilmington* have a treasurer or no treasurer, and as the existence of such an officer did not enter into the system of government when the convention was forming it, it cannot be supposed that the qualifications or disqualifications which they sought to apply to their officers, were designed by them to be extended and applied to such corporation officers.

But we pass from these considerations to other, equally strong, constitutional objections underlying the position of contestant's counsel.

VII. If it is to be determined that *Wallace*, while mayor, became, by the discharge of judicial duties, incidental or otherwise, such a judicial officer as is contemplated by the constitution, then we contend—

That so much of the act for the incorporation of cities, adopted *March* 9, 1857, as confers the judicial power in question upon an officer charged with executive duties, is in open violation of art. 3 of the constitution, which declares that "The powers of the government are divided into three separate departments—the legislative, the executive, including the administrative, and the judicial—and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this constitution expressly provided." See *Hayburn's* case, 2 Dall. pp. 409, 411; Story on the Const., § 1777; 4 Ind. R. 301.

VIII. Again; so much of the incorporating act as confers the powers of a justice of the peace upon mayors, is void, because violating § 22 of art. 4 of the constitution, as follows:

1. It is special and local legislation regulating the jurisdiction of justices of the peace. See act for incorporating cities, §§ 18, 19.

2. It is unconstitutional as to the tenure of office, substituting two years term in place of four, and requiring no commission before entering upon the duties. Compare §§ 9, 14, of act for incorporation of cities, § 14, art. 7, of the constitution, and § 6 of the justices' act, 2 R. S. p. 450.

3. It is unconstitutional as to the mode of election; the constitution, art 7, § 14, requiring an election by the voters of each township, while all city officers are elected by voters of the city.

IX. Again; if the mayor's Court, or Court of the city judge, be such a Court as is contemplated by the organic law, then so much of the city charter or

act of incorporation as provides for filling vacancies in the same by justices, or from elections ordered by the common council, is in open violation of § 18, art. 5, of the constitution, which provides that vacancies occurring in the office of the judge of any Court, shall be filled by appointment of the governor, until a successor is elected and qualified. See *The State* v. *Wilmington City*, 3 Harr., *supra*.

X. If *Wallace* is to be regarded as having been elected to two distinct offices—*i. e.*, mayor and city judge, so much of the incorporating act as has thus created a municipal and judicial office, and then merged both in the possession of the same officer, is void, as in direct conflict with § 9, art. 2, of the constitution, which provides that, "No person shall hold more than one lucrative office at the same time, except as in this constitution expressly permitted."

XI. Nor, while denying that the office resigned by *Wallace* was a judicial office in the sense required, do we regard it by any means as clear, that the one to which he was afterwards elected was within the constitutional inhibition.

The language employed is, "any office of profit or trust, under the state, other than a judicial one."

The word "state" has at least two primary significations, the one geographical, referring to the territory inhabited, and the other civil or politico-legal, representing the aggregated inhabitants, commonwealth, or body politic. It is upon the latter that constitutions are designed to operate, their subject-matter being the general government and political principles of the social organization. The direct object is to provide for state government, and not otherwise than incidentally for that of counties, townships, cities, and inferior organizations. In this view it is contended that the officers strictly contemplated are such as pertain to the state at large, and have immediate responsibility to, and powers arising from, the body politic. An office in a state, and one under it, are not necessarily identical in character; but on the other hand the phrases "office under the state" and "state office" are synonymous.

Are sheriffs such officers under the state, as are reached by the prohibition? We can hardly think so. Is it objected that they are referred to in the constitution? So are coroners, surveyors, and numerous other strictly county or township agents and officials. Is it claimed that they are officers discharging important duties within the state? So are the officers before mentioned, together with judges of the Circuit and District Courts of the *United States*, their clerks and marshals; and equally so are the presidents of banking institutions, insurance and other companies, and the officers of all private corporations. Is it said they are elected? So are a majority of those we have enumerated. But are these, or any of these, to be considered officers, with powers derived directly from, and responsible immediately to, the state organization? In short, are they, in any just sense, officers under the state, or state officers?

On the other hand, is it not true that sheriffs are properly ministerial officers, only, of the Courts for which they act—as regards the Supreme Court, appointed directly by, and responsible to, that body, and, as connected with other Courts, discharging executive duties, restricted in general by the Courts and counties within and for which they have been elected?

Discarding, then, as we do, the tests of constitutional interference, election, and discharge of duties within the state, it may well be asked, by what criterion we are to determine who are officers under the state or state officers, within the prohibition.

Perhaps the readiest answer may be found in the requirements of the constitution, providing as it does in § 18 of art. 5, that vacancies in all state offices shall be filled by temporary appointment by the governor. And again, in § 7 of art. 6, that all state officers shall be liable to impeachment by either or both branches of the General Assembly, as is therein provided.

But the sheriffalty is no such office, and a sheriff, surely, is no such officer. His vacancies, as to Circuit and Common Pleas Courts, are supplied directly by the coroner (2 R. S. p. 13 § 2), and as to the Supreme Court, by a new appointment from that body. Nor are sheriffs liable to impeachment for the causes and before the tribunals mentioned.

But admitting, for argument alone—the contrary of which we claim to have abundantly established—that the office originally held by *Wallace* was a judicial office, we proceed to inquire—

What was the effect produced by a resignation of the mayoralty?

The constitutional prohibition is ineligibility to office during the term for which he shall have been elected. How is this to be interpreted? What is its proper meaning?

Counsel for the contestant, relying, doubtless, on the general maxim, "that it is not allowable to interpret what has no need of interpretation," argue that the language used is simple and obvious, beyond the reach of Courts, and to be taken literally.

To this we answer, denying the premises assumed, and contending further, that interpretation is not confined alone to ambiguity, obscurity, or other defects of expression, as the maxim seemingly implies, but extends to all cases, however clear the words may be, where the literal sense would lead to false conclusions and decisions (Domat's Civil Law, Prel. B. 4, § 1); that constitutional provisions are to be expounded by the same rules adopted and applied to the construction of statutes (Smith on Const., p. 418); that the provision in question being remedial, and in derogation of natural and civil right, should receive a liberal, and so-called rational construction, such as, under the well known rule of Lord ERSKINE, best agrees with its subject matter, and is most promotive of the end in view (Ersk. Inst., B. 1, Tit. 1, § 52.—*Id.* § 58.— Smith on Const., pp. 826, 827.—Vattel, § 280.—Domat's Civil Law, Prel. B., p. 13.—Dwarr. p. 718); that it is the sole object of the interpretation of a statute, to discover the intention of the framers, and that a thing which is within the letter of the statute is not within the statute, unless it be within the intention of its makers (Bac. Abr., Stat. 1.—15 Johns. 380.—5 Term R. 449. —2 Burr, 786.—4 Gill and Johns. 6.—Plowden, 18.—11 Mod. 160); and that in interpretation it is not, in general, a true line of construction to decide accurately by the strict letter of the act; but that Courts will consider what is its fair meaning, and expound it differently in order to preserve the intent. 8 Rep. 27.—Broom's Legal Maxims, 299.—Co. Litt. 381.—Lord Keynon, 7.— Term R. 196.

And to a similar extent run decisions of more modern date.

In giving a construction to any statute, the Court must consider its policy, and give it such an interpretation as may appear best calculated to advance its object (3 Ham. 198); although such construction may seem contrary to the letter of the statute. 3 Cow. 89. And see, also, 1 Miss. R. 147; 2 Har. and Johns. 167; 2 Pet. 762; 1 Pet. 64; 12 Shep. 493; 19 Cow. 292.

We advance, then, the following propositions:

1. That the constitutional prohibition in question is one which attaches to the office, and not to the person of the incumbent.

2. That by resignation, the officer may determine the term for which he was elected.

3. That the vacancy thus created leaves no ground on which the prohibition can operate, and fully satisfies the true intent and meaning of the constitution.